**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**ROBERT PAUL FLEMING,**

        **Plaintiff,**

**v.**                                          **Case No. 8:14-cv-2548-T-30TBM**

**CAROLYN W. COLVIN, Acting
Commissioner of the United States
Social Security Administration,**

        **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

      Plaintiff seeks judicial review of the denial of his claim for Social Security disability

benefits.  Because the decision of the Commissioner of the United States Social Security

Administration is not supported by substantial evidence or is not in accordance with the

correct legal standards, I recommend that it be reversed and remanded for further

proceedings.

**I.**

**Procedural History**

      Plaintiff applied for disability insurance benefits in February 2009, alleging

disability as of November 30, 2005,[1] by reason of stiffness and paralysis on his left side and

fatigue.  (R. 172).  His application was denied originally, on reconsideration, and after a

---

[1]The onset date was amended to February 6, 2007.  (R. 36, 144).

hearing before an Administrative Law Judge ("ALJ") on September 1, 2010.[2]  By letter dated

December 10, 2010, Plaintiff (via his wife as "POA") complained of "unfair and bias

treatment" by the ALJ.  (R. 145-50).  Plaintiff also sought review of the ALJ's decision.  The

Appeals Council considered additional evidence and the allegation of bias but denied review.

(R. 1045-50).  Thereafter, Plaintiff commenced a civil action in the district court.  *See* Case

No. 8:11-cv-2578-T-27EAJ.

On April 1, 2013, the district court affirmed the ALJ's decision and entered

judgment in favor of the Commissioner.  *See id.* (Docs. 14, 19, 20).  Plaintiff appealed.  *Id.*

(Doc. 22).

On December 17, 2013, the United States Court of Appeals for the Eleventh Circuit

held otherwise, reasoning that:

> [e]ven if the ALJ properly discredited Dr. Moss's RFC
> assessment, the ALJ still committed reversible error by
> failing to state with particularity the weight given to several
> of Fleming's treating physicians, including Dr. Hauser, Dr.
> Garcia DeSousa, and Dr. Mukesh Mehta, and [ ] gave undue
> weight to both Cook's opinion and Dr. Ravipati's opinion.

(R. 982).  On this basis, the Eleventh Circuit "vacate[d] the district court's order and

remand[ed] this case with directions that the district court remand the case to the ALJ to give

proper weight to all medical opinions presented at the administrative hearing."  (R. 982-83).

---

[2]By decision dated October 7, 2010, the ALJ determined that while Plaintiff had
severe impairments related to history of traumatic brain injury, history of fibromyalgia,
history of mild degenerative disc disease of the cervical and lumbar spine, and history of deep
vein thrombosis, he nonetheless had the functional capacity to perform less than the full range
of light exertional work.  Upon this finding and testimony of a vocational expert, the ALJ
concluded that Plaintiff could perform jobs available to him in the local and national economy
and, thus, was not disabled.  (R. 18-28).

The Eleventh Circuit declined to address the other issues Plaintiff raised on appeal because they could be affected after a reassessment on remand.  (R. 983).  Mandate issued on February 20, 2014.  (R. 976).

On March 20, 2014, before any action was taken by the district court, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ "for further proceedings consistent with the order of the court."  Additionally, the Appeals Council directed the ALJ to "address the additional evidence submitted, take any further action needed to complete the administrative record and issue a new decision."  (R. 973, 1064).

By letter dated April 14, 2014, the director of the Office of Disability Adjudication and Review ("ODAR") in St. Petersburg, Florida, advised Plaintiff and his attorney that proposed exhibits in his claims file were ready for review.  She instructed Plaintiff to submit all non-duplicative medical and other records, complete and submit three questionnaires enclosed with the letter, and advise ODAR when all relevant evidence was up-to-date and the case was ready to be scheduled.  Thereafter, Plaintiff's case would be reviewed to determine if a fully favorable decision could be made without holding a hearing; if it could not, a hearing would be scheduled.  (R. 1190-91).

On June 12, 2014, the ALJ issued an unfavorable decision without holding a hearing or giving additional notice to Plaintiff.  In doing so, the ALJ explained:

> The matter remains under the jurisdiction of the undersigned
> [ALJ].  On April 14, 2014, the hearing office advised the
> claimant and his attorney, Ms. Barrett, that the proposed
> exhibits regarding this matter were available for review on
> the SSA's certified electronic folder . . ..  The undersigned
> has received no subsequent response in the intervening 45
> plus days.  Moreover, the ALJ notes the fact that the

> previous decision withstood the scrutiny of the Appeals
> Council and United States Magistrate and District Court
> Judges.  The sole reason for the Eleventh Circuit remand
> regarded concerns with the analysis of the medical opinions
> of record, and not due to a lack of proper development of the
> file, inadequate hearing testimony, or other due process
> issues.  SSA policy guidance at subsection (E) of HALLEX
> 1-2-7-40 indicates that, on remands involving Title II
> disability claims in which the period at issue expired before
> the date of the hearing decision, the claimant need not be
> offered the opportunity for a hearing unless the ALJ finds
> that the facts warrant it.  The undersigned sees no reason to
> offer the claimant a subsequent hearing in light of the facts
> herein, consistent with the guidance outlined in HALLEX
> and the fact that neither the Federal courts nor the Appeals
> Council have ordered the ALJ to do so.

(R. 947-48).  The ALJ then found that, during the period at issue, i.e., from Plaintiff's alleged

onset date of February 6, 2007, through Plaintiff's date last insured ("DLI") of December 31,

2008, Plaintiff had severe impairments related to history of traumatic brain injury ("TBI"),

fibromyalgia, degenerative disease of the cervical and lumbar spine, [an] episode of deep vein

thrombosis ("DVT") and pulmonary embolism, and obesity.  Despite these impairments, the

ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a

limited range of light work with postural and environmental limitations.  Upon that

determination and the September 2010 hearing testimony of the vocational expert ("VE"), the

ALJ concluded that Plaintiff could perform work available in the national economy and,

accordingly, was not disabled.  (R. 947-63).  The ALJ advised Plaintiff that he had 30 days

within which to file written exceptions with the Appeals Council.[3]  Plaintiff did not file

---

[3]The district court's remand order was entered the day after the ALJ's decision.
Therein, the ALJ was directed "to give proper weight to all medical opinions presented at the
administrative hearing" in accordance with the appellate decision.  *See* Case No. 8:11-cv-

4

written exceptions with the Appeals Council.  On August 12, 2014, the ALJ's decision of

June 12, 2014, became the final decision of the Commissioner.[4]  (R. 944-45).

On October 8, 2014, Plaintiff timely initiated this action.  (Doc. 1).

## II.

## Governing Statutory and Regulatory Framework

Entitlement to Social Security disability benefits requires the claimant establish that

he or she is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which . . . has lasted or can be expected to last

for a continuous period of not less than 12 months. . . ."  42 U.S.C. § 423(d)(1)(A).  A

"physical or mental impairment," under the terms of the Act, is one that "results from

anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques."  *Id.* at § 423(d)(3).

The Social Security Regulations set forth a five-step sequential evaluation process

the ALJ must follow in determining whether a claimant is disabled.  20 C.F.R.

§§ 404.1520(a), 416.920(a).  Under this five-step sequential evaluation, the ALJ considers:

(1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the

claimant has a severe impairment or combination of impairments; (3) if so, whether the severe

impairment meets or equals an impairment listed in the listing of impairments; (4) if not,

whether the claimant has the functional capacity to perform his past relevant work; and (5) if

---

2578-T-27EAJ, (Doc. 25).

[4]Because Plaintiff did not file written exceptions to the ALJ's decision and the
Appeals Council did not otherwise assume jurisdiction, the ALJ's decision became the final
decision of the Commissioner after remand.  *See* 20 C.F.R. § 404.984(d).

not, whether, in light of the claimant's age, education and work experience, the claimant can

perform other work that exists in significant numbers in the national economy.  20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).  The burden is on the claimant to prove the first four steps,

and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step.

*Jones v. Apfel,* 190 F.3d 1224, 1228 (11th Cir. 1999).

A determination by the Commissioner that a claimant is not disabled must be upheld

if it is supported by substantial evidence and comports with applicable legal standards.  *See*

*id.* at § 405(g).  Substantial evidence is "such relevant evidence as a reasonable person would

accept as adequate to support a conclusion."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th

Cir. 2001) (quotations omitted).  The Commissioner must apply the correct law and

demonstrate that she has done so.  While the court reviews the Commissioner's decision with

deference to the factual findings, no such deference is given to the legal conclusions.  *Moore*

*v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citations omitted).

It is, moreover, the function of the Commissioner, and not the courts, to resolve

conflicts in the evidence and to assess the credibility of the witnesses.  *Grant v. Richardson*,

445 F.2d 656 (5th Cir. 1971).  Similarly, it is the responsibility of the Commissioner to draw

inferences from the evidence, and those inferences are not to be overturned if they are

supported by substantial evidence.  *Celebrezze v. O'Brient*, 323 F.2d 989, 990 (5th Cir. 1963).

Therefore, in determining whether the Commissioner's decision is supported by substantial

evidence, the court is not to re-weigh the evidence, but is limited to determining whether the

record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that

the claimant is not disabled.  *Moore*, 405 F.3d at 1211.

6

In sum, the scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988).

### III.

### Review of the Medical Evidence

The relevant period at issue in this case is relatively short, -- from Plaintiff's alleged onset date of February 6, 2007, through his DLI of December 31, 2008.  Yet, the medical and psychological evidence spans a period of more than ten years.  A review of that evidence is necessary to provide context for Plaintiff's impairments and claims.  A chronology of it follows.

Evidence Predating the Relevant Period

In September 1986, Plaintiff was involved in a serious motor vehicle accident at age seventeen.  He sustained multiple injuries including a cerebral contusion, ruptured spleen, rib fractures, a left scapula fracture, a left pneumothorax, traumatic pericarditis, and sepsis secondary to an infection.  He was hospitalized for over a month.  (R. 888-91).

Beginning in April 1987, Judith Waldman, Ph.D., treated Plaintiff for problems resulting from the head trauma, including variable impulse control, diminished judgment and planning skills, lowered frustration tolerance and perseverative thinking.  (R. 931-32).  She opined that Plaintiff required a minimum of six months of treatment.  (R. 931).

In September 1988, Plaintiff's neurologist referred him to Alan J. Lewis, Ph.D., for a neuropsychological evaluation.  (R. 909).  Testing revealed cognitive and emotional changes

as a result of the car accident.  Dr. Lewis diagnosed organic personality syndrome and

personality disorder, and predicted Plaintiff would "experience difficulty in learning new

tasks" and need to "devote a great deal of effort to acquiring and integrating new

information."  (R. 911).

In 2004, Haig Yardumian, D.O., treated Plaintiff on at least fifteen occasions.

(R. 520-41).  Regarding Plaintiff's right hand and arm, the doctor noted a normal motor

system exam, no atrophy, and normal sensation.  (R. 533).  An MRI of Plaintiff's brain was

unremarkable.  (R. 520).  Despite those findings, Dr. Haig opined that "functional limitations

of hands quite obvious but etiology is not."  (R. 520).  He diagnosed tenosynovitis[5] of the

wrists and hands and "peripheral neuropathy upper extremity."  (R. 520).  He referred

Plaintiff for a neurology consult.  (R. 520).

In May 2004, Garcia DeSousa, M.D., performed the consult.  An MRI of Plaintiff's

brain appeared unremarkable.  Neurological, motor system, and sensory exams were normal,

but the neurologist reported that Plaintiff had "some difficulty particularly with holding

objects with his right had . . . and incomplete flexion of the fingers" and his "right hand

function is obviously not normal."  (R. 287).  His impression was "right hand weakness,

etiology to be determined."  *Id.*  He recommended an MRI of the cervical spine and brachial

plexus, as well as an EMG and nerve conduction studies.  *Id.*

In March 2005, Plaintiff was involved in another car accident.  (R. 297).  He

complained of neck pain that radiated to his right arm, difficulty using his right arm, hip

---

[5]Tenosynovitis is inflammation of the lining of the sheath that surrounds a tendon.
https://www.nlm.nih.gov/medlineplus/ency/article/001242.htm (last visited Feb. 9, 2016).

problems, and left leg pain.  *Id.*  He treated with William A. La Torre, D.C., and Ronald E.

Ostrander, D.C., from April 2005 through November 2006.  *See, e.g.,* (R. 494, 596).

In February 2006, Dr. DeSousa evaluated Plaintiff on referral of Ronald Ostrander,

D.C.  Plaintiff complained of neck pain, pain radiating to the right arm, difficulty using the

right arm, hip problems, and pain in the left leg.  (R. 297).  Dr. DeSousa observed a slightly

restricted range of motion in the neck but otherwise normal examination.  He also observed:

> [Plaintiff] seems to have some problems with his right hand.
> At times it appears to me that he has some sort of
> dysfunction in the right hand which does not look normal.
> He seems to exhibit some kind of a posturing in the right
> hand.  I am not entirely sure what is going on with him.

(R. 298).  Diagnoses included right upper extremity pain likely secondary to cervical

radiculopathy and a cervical sprain injury.  He ordered MRIs.

Dr. DeSousa saw Plaintiff for follow-up in March, September, and October 2006.

(R. 290, 293-94, 299-300).  The brain MRI showed atrophy, but the doctor stated he did not

see any significant pathology.  The cervical spine MRI revealed spondylotic changes and

evidence of bilateral foraminal narrowing, which the doctor reported possibly could account

for the radiculopathy symptoms in Plaintiff's arms.  (R. 299).  Examination of Plaintiff's right

hand in September showed slight dexterity problems and possible coordination problems.

(R. 293).  Examination of all other systems was normal.  An EMG and MRI of Plaintiff's

right arm were unremarkable, nerve conduction studies indicated carpal tunnel syndrome, and

an MRI of the right hand showed mild tenosynovitis of the extensor pollicis longus.  (R. 290).

<u>Evidence During the Relevant Period</u>

Medical evidence during the relevant period -- from February 6, 2007, through December 31, 20008, consists almost entirely of records from orthopedic surgeon Steven Moss, M.D.[6]  Plaintiff complained of pain and stiffness, right elbow pain, bilateral pain in the wrists and hands, and pain in his left leg, hips, back, and foot.  At times, Dr. Moss observed muscle spasms in the hips and legs, internal rotation of the left hip, equinus deformity of the left foot, and tenderness in the suprascapular muscles, trapezius muscles, paraspinal muscles of cervical, thoracic, and lumbar spine; and over the sacroiliac joint.  Diagnoses included lumbago, myalgia and myositis, displacement of the cervical intervertebral disc with myelopathy, and displacement of the lumbar intervertebral disc without myelopathy.  Dr. Moss treated Plaintiff with cortisone injections in multiple areas and medical management. On April 1, 2009, Dr. Moss completed a Physical Residual Functional Capacity Questionnaire.  (R. 488-91).  Therein, he reported Plaintiff suffered primarily from multiple head traumas which resulted in left sided paralysis, pain, and stiffness, and a large number of functional limitations.  In his opinion, Plaintiff was unable to handle even low stress jobs; walk a city block; sit for more than twenty minutes at a time; sit, stand, and/or walk for two hours; lift and carry any weight; twist, stoop, crouch, and climb stairs and ladders; and perform any type of fine manipulation or reaching.  (R. 489-91).  Dr. Moss opined further that the limitations existed as of February 6, 2007.  (R. 491).

---

[6]Dr. Moss's records are difficult to read and hard to piece together by date.  On my review, it appears he treated Plaintiff twenty times in 2007, thirty plus times in 2008, and roughly fifteen times in 2009.  He also treated Plaintiff in 2010.

In addition, the records from the relevant period reflect that John DeCosmo, D.O., treated Plaintiff twice in September 2008.  Plaintiff complained of an intermittent tingling feeling throughout his body, pulses of numbness in the whole left side of his body, weakness, and feeling light headed.  Dr. DeCosmo noted point tenderness and muscle spasms in the cervical, thoracic, and lumbar paraspinal muscles.  There was no ankle swelling or foot deformity.  (R. 302-307).

<u>Evidence Postdating the Relevant Period</u>

In January and February 2009, Plaintiff was hospitalized for swelling of his lower left leg, extensive DVT in his left lower leg, and pulmonary emboli.  Mukesh Mehta, M.D., treated Plaintiff from January 30, 2009, to February 4, 2009, (Doc. 8-1), and February 12, 2009, to February 17, 2009 (R. 336-37, 347-48, 356-57).  Aside from starting anticoagulation therapy, Dr. Mehta made several observations.  For example, he reported that:

> [Plaintiff] has some degree of damage to the brain.  Actually it is very fine motor skills and he cannot synthesize the body's sensations.  He has a tendency to talk continuously and incessantly and some degree of higher functions are impaired.  So he cannot give a detailed account of his history.
>
> ***
>
> [Plaintiff] seems [ ] slightly emotionally labile, talks continuously almost like a garrulousness.  He is emotionally labile, at times starts crying, continuously talks even though he is a highly energetic individual.

(Doc. 8-1 at 2).  An MRI of Plaintiff's brain revealed "a tiny old cortical infarction" in the right parietal lobe.[7]  (R. 343).  The doctor also observed a clear discrepancy in length between

---

[7]"[A] stroke affecting the right parietal lobe causes a lack of sensation of the left arm and leg.  Additionally, the right parietal lobe gives a sense of awareness, so a stroke of the left parietal lobe may cause people to neglect one side of the body, or one side of the

Plaintiff's right and left legs, some memory impairment and restriction on cerebral function, an unsteady gait, and that Plaintiff weighed approximately 300 pounds.  (Doc. 8-1 at 3).

Plaintiff was hospitalized again from February 24, 2009, to March 2, 2009, after complaining of pain and dizziness during an office visit with his pulmonologist, Jose F. Luciano, M.D.  (R. 390-401).  Dr. Luciano diagnosed organic brain injury, DVT, and pulmonary embolism, and observed that Plaintiff had to be redirected after every question. He ordered a vascular consult.  Jeffrey Danetz, M.D., a vascular surgeon, assessed extensive left lower extremity DVT and pulmonary embolism with inadequate anticoagulation.  He recommended placement of an inferior vena cava filter and subsequently did so.  During this hospitalization, Drs. Luciano and Danetz made observations similar to those of Dr. Mehta, and both noted that Plaintiff was confused.  (R. 395, 398).

Dr. DeSousa treated Plaintiff again in March and April 2009.  (R. 407-08, 425-27). The neurologist reported that Plaintiff was using a walker, his gait was impaired, and he walked with his left foot turned inward for some reason, almost like a hemiparetic gait.  (R. 406, 426-27).  An MRI of Plaintiff's brain seemed to show a small stroke.  Imaging of Plaintiff's thoracic and lumbar spine showed herniated discs and spinal stenosis.  (R. 407). Among other things, Dr. DeSousa recommended that Plaintiff be referred to a tertiary care center for a second opinion because he could not explain all of Plaintiff's problems.  (R. 407). He also referred Plaintiff to Rafael L. Rocha, M.D., a hematology oncologist, for evaluation of a suspected hypercoagulable state.

---

environment."  http://stroke.about.com/od/stroke101/fl/Cortical-Stroke.htm (last visited Feb. 26, 2016).

12

Dr. Rocha evaluated Plaintiff in April 2009.  (R. 445).  Findings on examination included normal strength on the right side but weak and uncoordinated on the left, diminished fine motor activity on both hands, and mild edema of the left leg compared to the right.  (R. 446).  The doctor noted that Plaintiff used a walker to ambulate and had to drag his left leg. He recommended a repeat of the lupus anticoagulation profile, the submission of other antibodies to evaluate for the antiphospholip syndrome, and an evaluation by a rheumatologist.  (R. 446).

In June 2009, on referral from Dr. DeSousa, Plaintiff was evaluated by Robert Hauser, M.D., at University of South Florida Parkinson's Disease and Movement Disorders Center.  (R. 471).  Among other things, Dr. Hauser's neurologic evaluation revealed mild-to-moderate decreased blink rate; normal motor strength and pinprick in the upper and lower extremities; no tremor; fine coordinated movements moderately reduced on the right upper extremity and slightly reduced in the left upper extremity; involuntary right wrist extension, right index finger extension, and right thumb flexion; essentially normal tone in the upper extremities with periods of increased tone in the right upper extremity; slight to mildly increased tone in the lower extremities; marked left foot plantar flexion and inversion upon arising; ability to ambulate and take steps of mildly shortened length on a narrow base; normal heel and toe tapping bilaterally; and deep tendon reflexes mildly increased in the upper extremities, moderately increased at the knees, and mild to moderately increased at the ankles.  (R. 472).  Dr. Hauser opined:

> This patient's history and examination are suggestive of posttraumatic dystonia.  His exam is currently dominated by left lower extremity dystonia, mostly in the distal left lower

13

> extremity.  He also has upper right extremity dystonia and
> this impairs his fine coordinated movements and ability to
> write.  In addition, he does seem to have some hyperreflexia
> bilaterally particularly in the lower extremities and some
> mild parkinsonism mostly manifest by decreased blink rate,
> and facial expression.  I did not perform a full
> neuropsychologic battery, but it seems likely that he may
> have some cognitive dysfunction related to his history of
> closed head injury.  Dystonia following head injury can
> progress over time and I suspect this is the main source of
> his motor disability.

(R. 472).[8]  He reported that dystonia primarily is treated with Botox injections but he first

would provide a short trial of Sinemet.  *Id.*

Also in June 2009, Murthy Ravipati, M.D., a nonexamining, state agency doctor,

completed an RFC form upon request of the SSA.  He indicated a primary diagnosis of left

DVT and pulmonary embolism, and a secondary diagnosis of history of TBI.  In his opinion,

Plaintiff retained the functional capacity to lift and carry twenty pounds occasionally and ten

pounds frequently; stand and/or walk for two hours in an eight-hour day; sit for about six

hours in an eight-hour day; and occasionally perform postural activities but never climb

---

[8]"Dystonia is a disorder characterized by involuntary muscle contractions that cause
slow repetitive movements or abnormal postures.  The movements may be painful, and some
individuals with dystonia a may have a tremor or other neurologic features."
http://www.ninds.nih.gov/disorders/dystonias/detail_dystonias.htm (last visited Feb. 2, 2016).
Early symptoms may include a tendency for one foot to turn or drag or a worsening in
handwriting.
www.medicinenet.com/dystonia/page2.htm#what_are_the_symptoms_of_dystonia (last
visited Feb. 9, 2016).  "In most cases, no abnormalities are visible using magnetic resonance
imaging or other diagnostic imaging."  *Id.*  "Currently, there are no medications to prevent or
slow the progression of any dystonia; however, there are several drugs that can reduce the
symptoms of dystonia (botulinum toxin, anticholinergic agents, benzodiazepines and
dopaminergic agents) and other methods such as deep brain stimulation and/or physical
therapy."  http://www.medicinenet.com/dystonia/article.htm#dystonia_facts (last visited Feb.
9, 2016).

ladders, ropes, or scaffolds.  Further, Plaintiff was to avoid concentrated exposure to extreme

heat and cold and even moderate exposure to hazards.  (R. 459-66).

In July and August 2009, Plaintiff received further treatment by Dr. Hauser.  (R.

467-69).  Dr. Hauser opined that Plaintiff had post-traumatic parkinsonism,[9] left lower

extremity and right upper extremity dystonia and spasticity.  (R. 467, 469).  He continued

Sinemet and added Botox injections.  *Id.*  Among other things, Dr. Hauser noted that

Plaintiff's left foot turns in when he stands up and his fine coordinated movements are

moderately reduced on the right and mildly reduced on the left.  He concluded that Plaintiff

has "marked dystonia in the left lower extremity with plantar flexion and inversion at the

ankle."  (R. 467).

In December 2010, Michael D. Eastridge, Ph.D., conducted a psychological

evaluation.  (R. 917-27).  He was provided with "an extensive collection of medical records,"

and his report includes a brief summary of the same.  After conducting a battery of

neuropsychological testing, Dr. Eastridge's diagnostic impressions included cognitive

disorder, NOS (which includes the frontal lobe dysfunction and memory impairment);

Parkinson's disease, by history; anxiety disorder, NOS, with agoraphobia; depressive

---

[9]"Parkinson's disease symptoms that result from severe or frequent head injuries are
referred to as post-traumatic parkinsonism."
http://www.everydayhealth.com/parkinsons-disease/movement-disorders.aspx (last visited
Feb. 2, 2016).  The primary symptoms of Parkinson's disease are "tremor, or trembling in
hands, arms, legs, jaw, and face; rigidity, or stiffness of the limbs and trunk; bradykinesia, or
slowness of movement; and postural instability, or impaired balance and coordination."
http://www.ninds.nih.gov/disorders/parkinsons_disease/parkinsons_disease.htm (last visited
Feb. 9, 2016).  "Other symptoms may include depression and other emotional changes;
difficulty in swallowing, chewing, and speaking; urinary problems or constipation; skin
problems; and sleep disruptions."  *Id.*

disorder, NOS; and organic personality disorder with passive avoidant features.  (R. 925).  He opined Plaintiff would experience the following functional limitations:  slow performance of tasks; poor judgment; an inability to work with the public, customers, and larger groups of coworkers; severely impaired memory for complex or novel instructions; and severely impaired pace of work.  (R. 926).

On December 23, 2010, Plaintiff's counsel sent a letter to Dr. Eastridge requesting that he answer two questions.  The first question asked if the clinical findings and diagnoses in his report would have existed and been disabling as of February 6, 2007.  In response, Dr. Eastridge opined that Plaintiff's "condition has certainly existed since 2007.  I am not sure about severity . . .."  The second question asked whether, based on his examination of Plaintiff, review of the records, and expertise as a psychologist, he believed that Plaintiff was a malingerer.  Dr. Eastridge opined he was not, explaining that "[Plaintiff] will say that he 'cannot' do things which he can do, such as draw.  This is an executive dysfunction symptom, in this particular case.  It looks like malingering, but it is not."  (R. 943).

In January 2011, Plaintiff's counsel contacted Dr. Hauser via letter and requested that he identify Plaintiff's diagnoses and the clinical findings that lead to same.  Dr. Hauser reported that clinical findings of dystonia, hyperreflexion, and parkinsonism led to his diagnosis of "post traumatic dystonia."  Counsel also inquired whether, based on his examination of Plaintiff, review of medical records, and expertise, he believed those would have existed at least as of December 31, 2008.  Dr. Hauser checkmarked "yes."  (R. 938).

## IV.

### Arguments on Appeal

Plaintiff raises eight claims.  Specifically, he argues that the ALJ erred by:

(1)     failing to afford the claimant a full and fair hearing on remand;

(2)     using VE testimony as grounds for her decision based on an incomplete hypothetical;

(3)     making internally inconsistent factual findings and failing to state with clarity the rule being applied;

(4)     failing to evaluate the effect of each impairment and the combined effect of those impairments;

(5)     failing to accord substantial weight to the opinion of Dr. Moss, a treating physician;

(6)     failing to properly evaluate his obesity in accordance with SSR 02-1P;

(7)     improperly substituting her judgment for that of Drs. Yardumian and DeSousa and disregarding opinions from Dr. Eastridge; and

(8)     failing to articulate adequate reasons for finding claimant not credible.

(Doc. 13).

As explained below, I find that a remand is required with regard to Plaintiff's first, third, fourth, and fifth claims and/or arguments made therein.  As such, these claims are the only ones addressed.  *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n. 2 (11th Cir. 1986) (stating that where remand is required, it may be unnecessary to review other issues raised).

### The ALJ Erred by Failing to Conduct a Hearing on Remand

By his first claim, Plaintiff contends the ALJ erred by not affording him the opportunity to appear and be heard at a hearing on remand.  Additionally, the local hearing

17

office informed him that a hearing would be held unless a fully favorable decision could be rendered.  Although the ALJ cited an agency policy guide in support of her decision to adjudicate his claim without a hearing, Plaintiff urges it does not trump his constitutional right to due process.  (Doc. 13 at 3-4).

The Commissioner argues that the ALJ was not required to hold a supplemental hearing because Plaintiff was afforded a full and fair hearing in September 2010 (almost two years after his insured status expired), Plaintiff was represented by counsel at that time and VE testimony was given, the Eleventh Circuit's remand order did not order that an administrative hearing be held on remand, and the ALJ properly followed agency policy. (Doc. 14 at 9).

The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  To this end, an ALJ has a basic duty to develop a full and fair record.  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  However, there must also be a showing of prejudice before the court can find a violation of due process sufficient to merit a remand.  *Brown v Shalala*, 44 F.3d 931, 935 (11th  Cir. 1995).  In this regard, "the court should be guided by whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'"  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).

While I recognize the discretion afforded the ALJ in these circumstances,[10] for the reasons which follow, I conclude that the ALJ failed in this regard by not affording Plaintiff a hearing on remand.  Had the diagnoses and opinions of Dr. Hauser been credited, the assessment of Plaintiff's functional capacity would likely have included some level of limitation with fine manipulation, and the VE's prior testimony suggests that no work would be available for an individual that lacked the ability to write and bilateral manual dexterity. (R. 96).

### The ALJ's Findings Related to Plaintiff's TBI

Within his third claim, Plaintiff argues that the ALJ made internally inconsistent findings that brought into question the validity of her findings and whether such were supported by substantial evidence.  Plaintiff challenges the ALJ's findings about the severity of his "history of traumatic brain injury."  In his view, the ALJ's following findings are inconsistent:  (1) Plaintiff's history of TBI constituted a severe impairment under the Act; (2) Plaintiff had no medically determinable mental impairment that was established within the period in issue; and (3) "[a]ssuming arguendo [Plaintiff's] history of traumatic brain injury

---

[10]I also recognize there is authority to the contrary.  *See, e.g., Dominick v. Bowen*, 861 F.2d 1330, 1332 (5th Cir. 1988) (upholding district court's finding that claimant was not entitled to another hearing because remand order required only application of new legal standard, and claimant did not request another hearing or respond with additional evidence when asked to do so by the ALJ).  In this case, however, Plaintiff specifically was told that a hearing would be held if a fully favorable decision could not be rendered.

would constitute a medically determinable impairment, it is also only minimally severe."[11] (Doc. 13 at 9).

In response, the Commissioner appears to argue that the ALJ did not err in this regard because the ALJ's RFC finding adequately accounted for any limitations resulting from Plaintiff's history of TBI. (Doc. 14 at 11-12).

While the Commissioner's argument is not without some appeal, the ALJ's findings regarding the severity and limitations (if any) arising from Plaintiff's TBI are confusing at best. Beyond that, the ALJ addressed Plaintiff's TBI solely in the context of a "mental impairment." *See* (R. 950). As urged by Plaintiff, in doing so the ALJ ignored the medical support for his allegations of motor dysfunction attributable to his TBI. The failure to consider the physical impact of TBI is significant. Had the ALJ done so, there would have been a basis for finding some degree of limitation with regard to Plaintiff's right hand and left leg.[12] (R. 956-57). "A clear articulation of . . . fact . . . is essential to [the court's] ability to conduct a review that is both limited and meaningful." *Owens v. Heckler*, 748 F.2d 1511, 1514-15 (11th Cir. 1984). The ALJ failed to do so with regard to Plaintiff's TBI.

## The ALJ Erred by Discounting Dr. Hauser's Diagnoses and Opinions

Within his fourth claim, Plaintiff faults the ALJ for discounting the opinions of Drs. Mehta, Hauser, and Eastridge on grounds that the opinions were rendered after his insured

---

[11]Plaintiff also makes a similar argument regarding the ALJ's findings relating to his DVT and pulmonary embolism. That argument is less persuasive and is not discussed.

[12]As an aside, the ALJ also found that fibromyalgia as a severe impairment. (R. 950, 957). Notably, in light of the statement above, Plaintiff's fibromyalgia did not result in any functional limitations.

20

status expired.  Further, he complains that the ALJ impermissibly picked and chose elements of those opinions and substituted her judgment for that of a doctor.  (Doc. 13 at 7, 11-12).

The Commissioner counters that the ALJ properly discounted the opinions of Drs. Mehta and Hauser because they examined Plaintiff after his insured status expired and their opinions were inconsistent with the treatment records during the relevant period.  Similarly, she argues the ALJ was correct in discounting Dr. Eastridge's opinions because he examined Plaintiff on only one occasion after Plaintiff's insured status expired, Dr. Eastridge was unsure of the severity of Plaintiff's mental impairments, and the treatment records from the relevant period did not demonstrate a psychological diagnosis or continuing mental health treatment.  (Doc. 14 at 16-17).

Here, the ALJ found that Dr. Hauser's 2009 diagnoses of post-traumatic Parkinsonism, right upper extremity dystonia with spasticity, and left lower extremity dystonia were "too far removed" from Plaintiff's DLI, "especially . . . in light of the equivocal findings noted earlier."  (R. 956).  Additionally, the ALJ noted that Plaintiff's right arm and hand complaints perplexed Drs. Yardumian and DeSousa, the right arm MRI was negative, carpal tunnel syndrome was diagnosed only once and essentially ruled out cervical radiculopathy, the chiropractic evidence provided little insight, and Dr. Moss provided only "conservative" treatment and his records showed few references to upper arm abnormalities and deficits in fine/gross manipulation.  (R. 956-57).  Further, the ALJ noted the many instances in which Dr. Moss failed to identify an abnormal gait and the absence of, or minor nature, any problems with Plaintiff's legs and gait.  (R. 957).  As additional support, the ALJ noted that Plaintiff did not seek disability benefits at the time he alleged experiencing

21

disabling symptoms; rather, the date he did so coincided with the episode of DVT in 2009. (R. 957). Similarly, the ALJ accorded "very little weight" to Dr. Hauser's opinion that the clinical signs and findings he observed in 2009 existed prior to Plaintiff's DLI because:

> [T]he medical summary the undersigned provides above shows that what Dr. Hauser observed in the summer of 2009 does not match what was observed prior to December 31, 2008. Indeed, the diagnosis of dystonia is not even a medically determinable impairment for the period at issue.

(R. 960).

On thorough review of the administrative record, I conclude that the ALJ erred by discounting the diagnoses and opinions of Dr. Hauser. In this circuit, an ALJ typically must give a treating physician's opinion substantial or considerable weight unless good cause is shown to the contrary. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citing *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997)). This rule applies "even if the physician did not treat the claimant during the pertinent period of time." *Dempsey v. Comm'r of Soc. Sec.*, 454 Fed. App'x 729, 733 n.7 (11th Cir. 2011). Moreover, treating physician's diagnosis of a claimant's condition may be made after the relevant determination date and is entitled to significant weight if it is based on objective medical criteria. *See Boyd v. Heckler*, 704 F.2d 1207, 1211 (11th Cir. 1983), *superseded on other grounds by statute*, 42 U.S.C. § 423(d)(5); *see also Mason v. Comm'r of Soc. Sec.*, 430 Fed. App'x 830, 831 (11th Cir. 2011) (providing that a retrospective diagnosis should be considered when corroborated by evidence contemporaneous with the relevant period).

It is undisputed that Dr. Hauser was a treating doctor. And, contrary to the ALJ's findings, Dr. Hauser's diagnoses of right arm/hand and left leg dystonia are corroborated by

22

contemporaneous evidence available before the DLI.  While intermittent, Plaintiff complained

to Dr. Moss of stiffness, impaired balance, difficulty gripping and writing, and difficulty

walking, and Dr. Moss treated the same by weekly and/or monthly cortisone injections in

various parts of Plaintiff's body.  Additionally, the complaints Plaintiff made to Dr.

DeCosmo, while initially appearing odd or incredible, are remarkably similar to those noted

with dystonia, parkinsonism, and/or a stroke occurring in the right parietal lobe.

The medical records predating Plaintiff's alleged onset date also corroborate the

same.  As early as 2004, Dr. Yardumian opined that Plaintiff had difficulty with his hands

which could relate only to issues with the brain.  Similarly, Dr. DeSousa diagnosed "right

hand weakness" of unknown origin in 2004.  While the ALJ is correct that neither doctor was

sure of its etiology, neither questioned that the problem existed and their opinions support

Plaintiff's allegations.  Further, despite the mostly normal findings on examination, Dr.

DeSousa reported Plaintiff's "right hand function [was] obviously not normal."  (R. 287).

The ALJ made no mention of that.

The medical records immediately following Plaintiff's DLI lend further support.  Dr.

Mehta noted a degree of brain damage evidenced by very fine motor skills and an inability to

synthesize body sensations, some memory impairment and restriction on cerebral function,

and a discrepancy in the length of Plaintiff's legs, and Dr. Rocha noted diminished fine motor

activity bilaterally and that Plaintiff dragged his left leg.  Given Plaintiff's intermittent but

consistent complaints related to difficulties with his hand and left leg and documentation of

the same, it is inconceivable that the problems observed by Drs. Mehta and Rocha began at

the time of Plaintiff's DVT.  Lastly, the ALJ's failure to credit Dr. Hauser's opinions and

23

diagnoses calls into question the accuracy and validity of her determination of Plaintiff's RFC and assessment of the medical evidence.

To this end, the ALJ considered the "opinions" of Drs. DeSousa and Mehta, the ALJ noted neither doctor spoke to Plaintiff's functional workplace abilities aside from suggesting deteriorating problems in March 2009, *after* the DLI.  (R. 960) (emphasis in original).  The ALJ addressed Dr. DeSousa's report from March 2009, noting the doctor's observation of an impaired gait, and MRI findings of lumbar and thoracic "protrusions."  (R. 956).  In her view, that evidence did not necessarily show a more significant problem than those established prior to the DLI.  *Id.*  The ALJ also addressed Dr. Mehta's report of abnormal fine motor skills, emotional lability, continuous talking, an incessantly garrulous manner, etc., and Dr. Luciano's observations that Plaintiff appeared confused and had to be redirected after every question, but noted such came after the DLI.  *Id.*  Thus, the ALJ gave "little weight" to the opinions and observations of Drs. DeSousa, Mehta, and Luciano.  The ALJ concluded by stating:

> To reiterate a point made countless times already, these observations fall after the claimant's disability insured status expire.  To be sure, they came soon after the date last insured, but they still came after this date and the undersigned has adequately shown already that the evidence does not support such limitations prior thereto.

(R. 960).  Given the ALJ's failure to credit Dr. Hauser's diagnoses, her findings related to the opinions of these doctors is called into question.

While unrelated, Dr. Eastridge's opinions are worth addressing as well.  The ALJ addressed Dr. Eastridge's report, but gave "little weight to [his] examining source

statements," and declined to "provide an exhaustive examination" of his assessment in light

of other record evidence. (R. 958-59). In doing so, the ALJ noted that Plaintiff performed

semi-skilled, substantial, gainful work after receiving mental health treatment in 1988; did not

have any difficulty testifying about his medical history at the hearing; and that:

> The various medical sources identified almost never noted
> deficits in [Plaintiff's] ability to be an adequate historian.
> Dr. DeSousa, who apparently has some qualifications in not
> only neurology, but also psychology, always failed to
> express any concern for mental health functioning. Even
> from lay perspectives, where is there any indication in the
> records of [treating doctors or chiropractors] of mental health
> deficits? The only brain MRI reading that tends to support
> any allegation of mental health deficit was the one sought by
> Dr. DeSousa in February 2006- 12 months before the
> amended alleged onset date of disability. . . . [and] the
> undersigned reminds the reader that Dr. DeSousa seemed
> less impressed with his own subsequent reading . . ..

(R. 958). While conceding that Dr. Eastridge's report "seem[ed] to provide a thorough

discussion of the evidence," the ALJ found that it failed to reconcile the above discrepancies

and Dr. Eastridge "even admitted he was 'not sure' as to the severity of [Plaintiff's] condition

back to the alleged onset date of disability." (R. 958).

Aspects of the ALJ's consideration of Dr. Eastridge's opinions and diagnoses are

problematic. First, although Dr. Eastridge was an examining source, he is the only mental

health professional that specifically addressed Plaintiff's mental functioning during the

relevant period, albeit retroactively. Significantly, he addressed Plaintiff's capabilities

pertaining to memory and concentration difficulties and/or any other "mental" difficulties that

may have arisen as a result of the traumas to Plaintiff's head in 1987 and 2005. Although the

ALJ is correct that Dr. Eastridge was unsure whether Plaintiff's impairments were *disabling*

as of February 2, 2007, she ignores that he was unequivocal in stating that Plaintiff's "condition" had existed as of that time.  (R. 943).

Moreover, the ALJ's citation to Dr. DeSousa's records does not support her finding that Plaintiff lacked deficits in his "mental health functioning" or her rejection of Dr. Eastridge's assessment.  The ALJ apparently cited to Dr. DeSousa's records because she believed he had expertise in psychiatry or psychology.  That appears to be incorrect.  Dr. DeSousa provided a "neurology consult."  (R. 520).  Further, his examination notes and records plainly reveal him to be a neurologist, and not a psychiatrist or psychologist.  *See, e.g.,* (R. 299, 301, 520).  That Plaintiff's medical doctors and chiropractors failed to document mental health deficits also fails to support the rejection of Dr. Eastridge's report.  It is unclear why those sources would or should have documented such concerns since mental health is not their area of expertise.  In any event, the observations made by Dr. Mehta, Luciano, and Danetz tend to *support* Dr. Eastridge's opinion.  Finally, whether or not the brain MRIs revealed deficits also appears an insignificant reason to discount Dr. Eastridge's opinion in the absence of a medical opinion that deficits should have been revealed on MRI.  To the extent the ALJ concluded as much, it was impermissible for her to do so.  An ALJ may not substitute her opinion for that of a plaintiff's doctors.  *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982); *Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir. 1986); *see also Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring) (finding that an "ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians").

26

### The ALJ Erred by According Controlling
### Weight to the Opinion of a Nonexamining Doctor

Within his fifth claim, Plaintiff argues that the ALJ erred by relying on Dr.

Ravipati's RFC assessment because the opinion of a nonexamining doctor does not provide

substantial evidence on which to base a decision. Plaintiff also contends that Dr. Ravipati's

RFC opinion is unreliable in light of Dr. Ravipati's notation in the claims file that "he must

have copied the RFC of a different claimant onto this case." Finally, Plaintiff argues Dr.

Ravipati's opinion is not sufficiently supported because he did not review the entire file and

the ALJ's rationale for that being insignificant is unavailing. (Doc. 12 at 15-16).

The Commissioner responds that Dr. Ravipati's report is accurate because he signed

the RFC form on June 29, 2009, and accurately cited to evidence of record. As such, the ALJ

properly relied on his opinion in determining Plaintiff's RFC. (Doc. 14 at 15).

The report of a nonexamining, reviewing physician, when contrary to those of

examining physicians, is entitled to little weight in a disability case, and standing alone does

not constitute substantial evidence on which to base an administrative decision. *See Lamb v.*

*Bowen,* 847 F.2d 698, 703 (11th Cir.1988) (quoting *Sharfarz v. Bowen,* 825 F.2d 278, 280

(11th Cir. 1987)). However, an ALJ may rely on the opinion of a nonexamining doctor when

the opinion does not conflict with those of examining sources. *See Edwards v. Sullivan*, 937

F.2d 580, 584-85 (11th Cir. 1991).

As indicated above, Dr. Ravipati completed an RFC assessment form at the

reconsideration stage of the disability claims process. Therein, he opined that Plaintiff

retained the RFC to perform a limited range of light work.  In explaining how and why the

evidence supported his opinion, Dr. Ravipati stated:

> This is a 40 year old male alleging disability from multiple
> allegations prior to the DLI of 12/08.  There is H/O DVT and
> PE in 12/08 with recurrence in 2/09 possibly from
> noncompliance based on sub-therapeutic PT in 2/09.  Has
> been having left leg swelling and use of walker as per the
> MERs of 4/09.  There was also H/O [TBI] in the remote past
> along with MVA in 2005.  As per the records of 2006, there
> was mention of right arm weakness but no mention of left
> leg weakness.  There was mention of problems at the left
> hi+p causing gait disturbance including left foot turning
> inwards.  In spite of the limitation at the left hip currently he
> should improve from the left leg DVT by 12/09 and should
> perform at least the activities marked on the RFC.  Should be
> able to ambulate at least 2 hrs in a 8hr day after 12/09.  No
> evidence of any limitations in the upper extremities at this
> time.

(R. 460-61).  Significantly, Dr. Ravipati indicated there was not a medical source statement

regarding Plaintiff's physical capacities in the file.  (R. 465).  According to the explanation of

determinations at the initial and reconsideration levels, the file Dr. Ravipati reviewed

contained hospital records from 2009; Dr. DeSousa's records from 2004, 2006, and 2009; Dr.

Rocha's report from 2009; Dr. DeCosta's records from September 2008; and Dr. Ostrander's

2006 chiropractic notes.  (R. 104, 109).

The ALJ gave "great weight" to Dr. Ravipati's RFC opinion dated June 29, 2009,[13]

and adopted it in full.  In doing so, the ALJ explained that:

> While it is true that this opinion comes without consideration
> of the records from the claimant's chiropractors and Drs.
> Moss and Hauser, the undersigned has adequately shown the
> insignificance of the chiropractic treatment records, the
> inconsistencies with Dr. Moss's records, and the datedness
> of Dr. Hauser's summer of 2009 treatment.  Moreover, the
> records that came in from Drs. Lewis and Waldman were
> mental health in nature and old, and Dr. Eastridge's evidence
> comes well after the date last insured too.  Dr. Ravipati,
> while a nontreating and nonexamining source, is also well
> aware of Social Security regulations, rulings, rules, and
> standards.  *He offers as much detailed discussion and
> analysis of the record as any other source regarding the
> claimant's physical health, and the overall assessment
> remains consistent with the record evidence*.

(R. 960) (emphasis added).

Substantial evidence does not support the ALJ's decision to give great weight to the

RFC opinion of Dr. Ravipati, a nonexamining doctor.  Contrary to the ALJ's statement and,

as explained above, the ALJ erred by discounting Dr. Hauser's diagnoses and opinions.  As

such, the ALJ's primary rationale for crediting Dr. Ravipati's opinion fails.  Similarly, her

rejection of Dr. Moss's RFC opinion does not excuse the fact that Dr. Ravipati's opinion was

rendered on an incomplete record that failed to include the bulk of the medical records from

---

[13]Plaintiff is correct that Dr. Ravipati stated on June 16, 2009, that "I must have copied the RFC of a different claimant on to this case.  I will be out of the office from 6/15-6/22.  As soon as I come back I will take care of the matter."  I also note that the disability determination on reconsideration rests on Dr. Ravipati's RFC "dated June 8, 2009."  *See* (R. 100).  As noted by Plaintiff, that RFC form is not in the record.  While slightly suspect, I agree nonetheless with the Commissioner that despite Dr. Ravipati's statement of June 16, 2009, it appears that Dr. Ravipati completed the RFC form in the file based on Plaintiff's records and not records from another claimant.

the relevant period.  Further, given the inadequate consideration of post DLI medical and

psychological evidence which reasonably related to impairments existing during the pertinent

period, it is impossible to ascertain whether substantial evidence supports the ALJ's decision

to accord great weight to Dr. Ravipati's opinion.

Another factor undercutting the ALJ's reliance on Dr. Ravipati's opinion is that prior

to rendering his RFC opinion, Dr. Ravipati noted in the claims file that Plaintiff was to see a

neurosurgeon or neurologist (referring to Dr. Hauser) and directed DDS to "make sure we get

those . . . reports before we can decide on the RFC."  (R. 457).  Clearly, that never happened.

Second, and most importantly, the ALJ's other stated reason for according great weight to Dr.

Ravipati's opinion is incredulous.  It bears repeating again:

> He offers as much detailed discussion and analysis of the
> record as any other source regarding the claimant's physical
> health, and the overall assessment remains consistent with
> the record evidence.

(R. 960).  In light of Plaintiff's lengthy treatment history and repeated allegations of left-sided

pain and resulting fine motor and lower extremities limitations which may be found to be

fully supported given Dr. Hauser's diagnoses and opinions, that reason is without merit.

Lastly, Dr. Ravipati's opinion conflicts with treating and examining opinions that Plaintiff

suffered functional limitations in his right hand and the ALJ fails to explain exactly what

record evidence supports his assessment.

For the reasons stated above, I conclude that this case should be remanded for further

hearing and consideration.  On remand, the Commissioner should consider assigning a

different ALJ to conduct the hearing.  Additionally, by my consideration, the assistance of a

medical adviser is imperative to the proper consideration and decision on the retroactive

import of Dr. Hauser's diagnoses and opinions, as well as Dr. Eastridge's diagnoses and

opinions.  20 C.F.R. § 404.1527(e)(2)(iii) (stating ALJ may request and consider opinions

from medical experts on the nature and severity of a claimant's impairments).

### V.

For the foregoing reasons, the decision of the Commissioner of the United States

Social Security Administration is not supported by substantial evidence or is not in

accordance with the correct legal standards, and I recommend that it be reversed and

remanded for further proceedings, including a supplemental hearing, before the

Commissioner consistent with this Report and Recommendation.  Further, I respectfully

recommend that this case be assigned to a different ALJ on remand.  This case has been

evaluated twice by the same ALJ and Plaintiff has alleged unfairness and bias in her

consideration of his claim.  Even in the absence of bias, the Commissioner remains free to

assign the matter to a different ALJ on remand, if appropriate, in response to a request from

Plaintiff or otherwise.  Lastly, I recommend that the Clerk be directed to enter Judgment in

favor of the Plaintiff and to close the case, and the matter of fees and costs shall be addressed

upon further pleadings.

Respectfully submitted this
4th day of March 2016.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES OF EXPEDITED OBJECTION PERIOD

Failure to file written objections to the proposed findings and recommendations

contained in this report on or before **March 14, 2016**, shall bar an aggrieved party from

attacking the factual findings on appeal and a *de novo* determination by a district judge.  28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6.


Copies furnished to:
The Honorable James S. Moody, United States District Judge
Counsel of Record